FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 24, 2021

SEAN F. McAVOY, CLERK

Daniel S. Kahn
Acting Chief, Fraud Section
U.S. Department of Justice
Avi Perry
Acting Principal Assistant Chief
John ("Fritz") Scanlon
Trial Attorney
1400 New York Avenue NW
Washington, DC 20005
Telephone: (202) 514-2000

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

Plaintiff,

v.

CODY ALLEN EASTERDAY,

Defendant.

No. 4:21-CR-6012-SAB

INFORMATION

Vio: 18 U.S.C. § 1343
Wire Fraud

18 U.S.C. § 982
Forfeiture

The Acting Chief of the Fraud Section, Criminal Division, United States Department of Justice charges:

At all times relevant to this Information:

**GENERAL ALLEGATIONS**

**I.    The Defendant and Relevant Individuals and Entities**

1.    Defendant **CODY ALLEN EASTERDAY** lived in Franklin County, Washington.  **CODY ALLEN EASTERDAY** was the president and an owner of Easterday Ranches, Inc. ("Easterday Ranches"), and he controlled the company.

2.      Easterday Ranches was a for-profit corporation organized under the laws of the State of Washington.  Easterday Ranches was a cattle-feeding operation and maintained its principal office in Pasco, Washington.

3.      Easterday Employee 1 was an employee and agent of Easterday Ranches who worked in Easterday Ranches' office in Pasco, Washington.

4.      Easterday Employee 2 was an employee and agent of Easterday Ranches who worked in Easterday Ranches' office in Pasco, Washington.

5.      Tyson Foods, Inc. ("Tyson Foods") was a publicly traded company organized under the laws of Delaware, and its principal executive office was located in Springdale, Arkansas.  Tyson Foods was a multi-national, protein-focused food company producing approximately 20% of the beef, pork and chicken in the United States.

6.      Tyson Fresh Meats, Inc. ("Tyson Fresh Meats") was a Delaware corporation and a wholly owned subsidiary of Tyson Foods.  Tyson Fresh Meats operated a number of beef plants, including a plant located in or around Pasco, Washington (the "Pasco Plant").  This Information will use "Tyson" to refer collectively to Tyson Foods and Tyson Fresh Meats.

7.      Tyson Employee 1 was an employee and agent of Tyson.  Tyson Employee 1 was a Manager in Tyson's Cattle Alliance Program.  Tyson Employee 1's primary office at Tyson was located in Dakota Dunes, South Dakota.

8.      Company 1 was a limited liability company organized under the laws of the State of Washington, and its principal office was located in Tukwila, Washington.

9.      CME Group Inc. ("CME") was a publicly traded company organized under the laws of Delaware that was headquartered in Chicago, Illinois.  CME operated a financial derivatives exchange that allowed traders to buy and sell, among other commodities, live cattle futures contracts.

**II.    The Cattle Feeding Agreements Between Easterday Ranches and Tyson**

10.    In or around March 2014, Easterday Ranches entered into a Cattle Feeding Agreement (the "2014 Agreement") with Tyson.

11.    Defendant **CODY ALLEN EASTERDAY** signed the 2014 Agreement on behalf of Easterday Ranches, identifying himself as the president and one of two owners of Easterday Ranches.  **CODY ALLEN EASTERDAY** also signed a personal guarantee included in the 2014 Agreement, in which he "unconditionally, irrevocably and absolutely guarantee[d], as primary obligor[] and not as suret[y], the full and timely payment, performance, and satisfaction by [Easterday Ranches] of all their obligations to [Tyson] pursuant to the terms of this agreement."

12.    Under the 2014 Agreement, Easterday Ranches agreed to procure feeder cattle on behalf of Tyson and provide feeding space for the cattle until they were sent for slaughter at the Pasco Plant.  Easterday Ranches agreed to provide Tyson supporting documentation regarding the procurement costs of the feeder cattle that Easterday Ranches proposed to purchase on behalf of Tyson.  Upon approval by Tyson, Easterday Ranches would purchase the feeder cattle, and Tyson agreed to reimburse Easterday Ranches for the purchase costs.  After the purchase, Tyson had the right to request title documents showing Tyson's ownership of the cattle.

13.    Under the 2014 Agreement, Tyson further agreed to reimburse Easterday Ranches for the costs associated with growing the purchased cattle to market weight.  Easterday Ranches agreed to seek such reimbursement by billing Tyson twice monthly.  Easterday Ranches agreed that the bills would accurately reflect the costs associated with growing the cattle to market weight.

14.    The 2014 Agreement provided that, in consideration of Tyson funding the costs of the cattle, along with funding the feed and care of the cattle, Easterday Ranches agreed to reimburse Tyson for all such costs, plus interest, as well as certain other costs, when the cattle were slaughtered at the Pasco Plant.  Easterday Ranches would keep as profit (if any) the amount by which the market value of the cattle at the time of slaughter

exceeded the costs it owed to Tyson.  If the market value of the cattle at the time of slaughter was below the costs Easterday Ranches owed to Tyson, Easterday Ranches would be required to pay Tyson the difference (i.e., Easterday Ranches would suffer a loss).

15.     In or around February 2017, Easterday Ranches and Tyson entered into another Cattle Feeding Agreement (the "2017 Agreement") whose relevant terms were substantially similar to those described above.  **CODY ALLEN EASTERDAY** signed the 2017 Agreement on behalf of Easterday Ranches, again identifying himself as Easterday Ranches' president and owner.  No other owners of Easterday Ranches were listed in the 2017 Agreement.  **CODY ALLEN EASTERDAY** also signed a personal guarantee included in the Agreement, in which he "unconditionally, irrevocably and absolutely guarantee[d], as primary obligor[] and not as suret[y], the full and timely payment, performance, and satisfaction by [Easterday Ranches] of all their obligations to [Tyson] pursuant to the terms of this agreement."

16.     In or around August 2020, Easterday Ranches and Tyson agreed to amend the 2017 Agreement to extend its term through August 20, 2021.  **CODY ALLEN EASTERDAY** signed the extension of the 2017 Agreement on behalf of Easterday Ranches, again identifying himself as the company's president.

**III.    The Agreements Between Easterday Ranches and Company 1**

17.     In addition to the cattle feeding agreements between Easterday Ranches and Tyson, and continuing until in or around September 2020, Easterday Ranches also entered into a series of livestock bills of sale involving Company 1.  Through these bills of sale, Easterday Ranches agreed to raise cattle on behalf of Company 1 until the cattle were slaughter-ready, using purchase funds and prepaid feed costs advanced by Company 1.  Easterday Ranches further agreed that, when the cattle ultimately were sold for slaughter, Easterday Ranches would repay the advanced funds to Company 1 plus 4% interest.  Easterday Ranches would keep as profit (if any) the amount by which the sale price at slaughter exceeded the costs it owed to Company 1.  If the sale price at

the time of slaughter was less than the amount Easterday Ranches owed to Company 1, Easterday Ranches would suffer a loss.  **CODY ALLEN EASTERDAY** signed each livestock bill of sale on behalf of Easterday Ranches.

## COUNT 1

## Wire Fraud

## 18 U.S.C. § 1343

18.    The allegations in Paragraphs 1 through 17 are realleged and incorporated herein by reference.

### The Scheme and Artifice to Defraud

19.    Beginning in or around 2016 and continuing through in or around November 2020, in the Eastern District of Washington and elsewhere, the Defendant **CODY ALLEN EASTERDAY** knowingly, and with the intent to defraud, devised and intended to devise a scheme and artifice to defraud Tyson, Company 1 and the CME and to obtain money and property from Tyson and Company 1 by means of materially false and fraudulent pretenses, representations, promises, and omissions, and did knowingly transmit and cause to be transmitted by means of wire communications in interstate commerce certain writings, signs, signals, pictures, and sounds for the purposes of executing such scheme and artifice.

### Purpose of the Scheme and Artifice to Defraud

20.    The object and purpose of the scheme and artifice to defraud was for Defendant **CODY ALLEN EASTERDAY** to unlawfully obtain money for himself and his company, Easterday Ranches, by: (1) submitting and causing others to submit materially false and fraudulent invoices and other information to Tyson and Company 1 that sought reimbursement for Easterday Ranches' purported costs of purchasing and growing cattle that did not actually exist; and (2) using the fraud proceeds for his personal use and benefit, and for the benefit of Easterday Ranches, including by covering approximately $200 million in commodity futures contracts trading losses.

Manner and Means of the Scheme and Artifice to Defraud

It was part of the scheme and artifice to defraud that:

21.    Beginning in or around 2016 and continuing through in or around November 2020, **CODY ALLEN EASTERDAY** transmitted and caused others to transmit emails from within the State of Washington to Tyson employees outside the State of Washington, that contained and attached materially false and fraudulent invoices and other information that sought reimbursement from Tyson for the purported cost of purchasing and growing hundreds of thousands of cattle that were never actually purchased by or delivered to **CODY ALLEN EASTERDAY** or Easterday Ranches, and that did not actually exist.

22.    When seeking reimbursement for cattle that Easterday Ranches purportedly purchased on behalf of Tyson under the 2014 and 2017 Cattle Feeding Agreements (collectively, the "Cattle Feeding Agreements"), **CODY ALLEN EASTERDAY** typically caused Easterday Employee 1 or another agent or employee of Easterday Ranches to send an email from Easterday Ranches' office in Pasco, Washington, to Tyson Employee 1, who was based in Dakota Dunes, South Dakota. The emails were frequently entitled "New Placements," and they attached (i) invoices from Easterday Ranches to Tyson seeking payment for cattle that Easterday Ranches had purportedly purchased on behalf of Tyson, and (ii) "Breakeven Projections," which set forth various information about the cattle that Easterday Ranches had purportedly purchased on behalf of Tyson, including the lot number, headcount, sex, and a financial analysis.

23.    The invoices and Breakeven Projections attached to these "New Placements" emails often sought millions of dollars from Tyson for thousands of head of cattle that **CODY ALLEN EASTERDAY** or Easterday Ranches purportedly purchased on behalf of Tyson under the Cattle Feeding Agreements.

24.    Beginning in or around 2016 and continuing through November 2020, **CODY ALLEN EASTERDAY** caused these "New Placements" emails to attach

materially false and fraudulent invoices and Breakeven Projections that sought reimbursement under the Cattle Feeding Agreements for the purported cost of purchasing cattle that were never actually purchased by or delivered to **CODY ALLEN EASTERDAY** or Easterday Ranches, and that did not actually exist.

25.    At the time **CODY ALLEN EASTERDAY** caused the "New Placements" emails attaching the materially false and fraudulent invoices and Breakeven Projections to be sent to Tyson, **CODY ALLEN EASTERDAY** knew that the invoices and Breakeven Projections sought payment for cattle that were never actually purchased by or delivered to **CODY ALLEN EASTERDAY** or Easterday Ranches, and that did not actually exist.

26.    Tyson made payments to Easterday Ranches in reliance on the invoices and Breakeven Projections attached to the "New Placements" emails, including the invoices and Breakeven Projections for the cattle that were never actually purchased by or delivered to **CODY ALLEN EASTERDAY** or Easterday Ranches, and that did not actually exist.

27.    When seeking reimbursement for the cost of feeding cattle that Easterday Ranches purportedly purchased on behalf of Tyson under the Cattle Feeding Agreements, **CODY ALLEN EASTERDAY** typically caused agents and employees of Easterday Ranches, including Easterday Employee 1 and Easterday Employee 2, to send an email from Easterday Ranches' office in Pasco, Washington, to Tyson employees based in Pasco, Washington.  These emails attached invoices from Easterday Ranches to Tyson seeking payment for the cost of feed used to grow the cattle that Easterday Ranches had purportedly purchased on behalf of Tyson

28.    Beginning sometime in or around at least 2018 and continuing through in or around November 2020, **CODY ALLEN EASTERDAY** caused these emails to attach materially false and fraudulent invoices that sought reimbursement under the Cattle Feeding Agreements for the purported cost of feeding cattle that were never

actually purchased by or delivered to **CODY ALLEN EASTERDAY** or Easterday Ranches, and that did not actually exist.

29.    In addition, **CODY ALLEN EASTERDAY** at times personally sent emails to Tyson employees seeking payment of the feed invoices, including the materially false and fraudulent feed invoices that sought reimbursement for the purported cost of feeding cattle that were never actually purchased by or delivered to **CODY ALLEN EASTERDAY** or Easterday Ranches, and that did not actually exist.

30.    At the time **CODY ALLEN EASTERDAY** caused the emails attaching the materially false and fraudulent feed invoices to be sent to Tyson and sent emails seeking payment of the invoices, **CODY ALLEN EASTERDAY** knew that the invoices sought payment for the cost of feeding cattle that were never actually purchased by or delivered to **CODY ALLEN EASTERDAY** or Easterday Ranches, and that did not actually exist.

31.    Tyson made payments to Easterday Ranches in reliance on the feed invoices attached to the emails, including the invoices for the cattle that were never actually purchased by or delivered to **CODY ALLEN EASTERDAY** or Easterday Ranches, and that did not actually exist.

32.    In total, as a result of the false and fraudulent representations that **CODY ALLEN EASTERDAY** made and caused to be made, Tyson paid Easterday Ranches approximately $233,008,042 for the purported costs of purchasing and growing hundreds of thousands of cattle that were never actually purchased by or delivered to **CODY ALLEN EASTERDAY** or Easterday Ranches, and that did not actually exist.

33.    In addition, beginning in or around March 2020 and continuing through in or around September 2020, **CODY ALLEN EASTERDAY** submitted and caused to be submitted to Company 1 false and fraudulent bills of sale and invoices that sought payment from Company 1 for the purported cost of purchasing and feeding cattle that were never actually purchased by or delivered to **CODY ALLEN EASTERDAY** or Easterday Ranches, and that did not actually exist.

34.    In total, as a result of the false and fraudulent representations that **CODY ALLEN EASTERDAY** made and caused to be made, Company 1 paid Easterday Ranches approximately $11,023,084 for the purported costs of purchasing and raising thousands of cattle that were never actually purchased by or delivered to **CODY ALLEN EASTERDAY** or Easterday Ranches, and that did not actually exist.

35.    **CODY ALLEN EASTERDAY** used a significant portion of the proceeds of the scheme to cover approximately $200 million in commodity futures contracts trading losses that **CODY ALLEN EASTERDAY** incurred on behalf of Easterday Ranches from in or around 2011 through in or around 2020.

36.    In connection with his commodity futures trading, on or around October 17, 2017, and again on or around July 12, 2018, **CODY ALLEN EASTERDAY** caused Easterday Ranches to submit to the CME an Application to Exceed Position Limits that falsely inflated the number of cattle in Easterday Ranches' inventory at the time the application was submitted.  Each of the applications was signed by **CODY ALLEN EASTERDAY** as the president of Easterday Ranches. These materially false and fraudulent applications were designed to permit Easterday Ranches to exceed position limits in live cattle futures contracts that the CME otherwise would have applied to Easterday Ranches.

<u>Interstate Wire in Furtherance of the Scheme and Artifice to Defraud</u>

37.    On or around May 7, 2020, in the Eastern District of Washington, and elsewhere, **CODY ALLEN EASTERDAY**, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, did knowingly transmit and cause to be transmitted, by means of wire, radio, and television communication, certain writings, signals, pictures, and sounds in interstate commerce, to wit: an email transmitted from a location inside the Eastern District of Washington to a location outside the State of Washington attaching, among other things, two materially false and fraudulent invoices from Easterday Ranches to Tyson seeking payment of approximately $5,314,326.11 for eight lots of cattle that were never actually purchased

by or delivered to **CODY ALLEN EASTERDAY** or Easterday Ranches, and that did not actually exist.

All in violation of Title 18, United States Code, Section 1343.

## NOTICE OF FORFEITURE

### 18 U.S.C. § 982

38.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), upon the defendant's conviction of the offense set forth in this Information.

39.    The defendant shall forfeit to the United States of America the following:

(a)    All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense; and

(b)    To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

40.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), the defendant, upon conviction, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

DATED this 23rd day of March , 2021

Daniel S. Kahn

Daniel S. Kahn

Acting Chief, Fraud Section

U.S. Department of Justice


Avi Perry

Acting Principal Assistant Chief, Fraud Section

U.S. Department of Justice


John ("Fritz") Scanlon

Trial Attorney, Fraud Section

U.S. Department of Justice