Glenn S. Leon
Chief, Fraud Section
U.S. Department of Justice
Avi Perry
Deputy Chief
John ("Fritz") Scanlon
Assistant Chief
1400 New York Avenue NW
Washington, DC 20005
Telephone: (202) 304-2946

Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Russell E. Smoot
Timothy M. Durkin
Brian M. Donovan
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> CODY ALLEN EASTERDAY, <br><br> Defendant. | No. 4:21-CR-06012-SAB-1 <br><br> **UNITED STATES' SENTENCING MEMORANDUM** |

Plaintiff, the United States of America, by and through Glenn S. Leon, Chief, Fraud Section, Criminal Division, United States Department of Justice, Avi Perry, Deputy Chief, Fraud Section, Criminal Division, United States Department of Justice, John ("Fritz") Scanlon, Assistant Chief, Fraud Section, Criminal Division, United States Department of Justice, Vanessa R. Waldref, United States Attorney for the Eastern District of Washington, and Russell E. Smoot, Timothy M. Durkin, and Brian M. Donovan, Assistant United States Attorneys for the Eastern District of Washington (collectively, "the United States"), hereby submits this sentencing memorandum, and states as follows:

The United States concurs with the Probation Officer's determination that Defendant Cody Allen Easterday's Total Offense Level is 32 and that his Criminal History Category is I. ECF No. 26 (Presentence Investigative Report ("PSR") ¶¶ 51, 62.) Easterday's applicable Sentencing Guidelines range is therefore 121 to 151 months. *Id.* ¶ 98. Pursuant to the factors contained in Title 18, United States Code, Section 3553(a), and for the reasons set forth below, the United States believes that a custodial sentence within the applicable Guidelines range is appropriate.

In addition, the United States recommends that the Court sentence Easterday to three years of supervised release, impose a special assessment of $100, and issue an order obligating Easterday to pay $244,031,132 in restitution to the victims.[1]

The sheer magnitude of the fraud that Easterday perpetrated is staggering. Easterday stole nearly a quarter of a billion dollars over the four-year period from 2016 through November 2020. To put that figure in perspective, the $244 million that Easterday stole would have funded the city of Yakima's entire police department for more than eight years (based on the city's 2020 budget).[2] It would have funded Yakima's fire department for more than fifteen years.[3] Or, it would have funded Yakima's municipal courts for more than 150 years.[4] Indeed, the $244 million that

---

[1] This figure reflects the total amount by which Easterday defrauded his victims and was agreed upon in the plea agreement, and the PSR contains the same figure. This amount would be reduced by any amounts that the victims have recovered or will recover in the future in the Easterday Ranches/Easterday Farms bankruptcy proceedings on their claims relating to Easterday's fraud.

[2] *See* City of Yakima 2020 Adopted Budget at 18, *available at* https://www.yakimawa.gov/services/finance/files/2020-Adopted-Budget.pdf (showing total police expenditures of $30,546,305).

[3] *See id.* (showing total fire expenditures of $15,482,039).

[4] *See id.* (showing total municipal court expenditures of $1,783,999).

United States' Sentencing Memorandum - 2

Easterday stole would have funded the combined police, courts, and fire budget of Yakima – a city of nearly 100,000 people – for more than four years.[5]

Easterday stole this enormous amount of money by lying to his victims repeatedly over four years. He manufactured scores of false and fraudulent invoices and other information that he then submitted or caused others to submit to his victims so that those victims would pay his company, Easterday Ranches, Inc., tens of millions of dollars to purchase and feed thousands of cattle on their behalf. But Easterday never purchased the cattle. Instead, Easterday betrayed his victims' trust and diverted a large amount of the proceeds of his fraud to cover huge losses he incurred while recklessly trading commodity futures contracts.

To be sure, Easterday has taken responsibility for his actions, and he has helped raise money to pay his creditors, although his victims, particularly Tyson Foods, Inc., are still out over $170 million. Such good conduct confirms the defendant's fulsome acceptance of responsibility for his criminal conduct. But such conduct does not excuse the more than four years of dishonesty and sheer magnitude of his fraud, and it is adequately addressed by the three-point reduction in offense conduct that Easterday is likely to receive for acceptance of responsibility. Such an adjustment would reduce Easterday's Sentencing Guidelines range from what otherwise would have been 168-210 months—a reduction of approximately four to six years.

A crime of this duration and magnitude demands a significant custodial sentence. In this case, a Guidelines range sentence of between 121 and 151 months would be sufficient, but not greater than necessary, to provide just punishment in this case, promote respect for the law, avoid the appearance of a two-tiered system of justice that treats white-collar defendants more favorably than other defendants, and deter others from committing similar crimes in the future.

---

[5] *See id.* at 16 (showing combined police, courts, and fire budget of $57,118,334).

United States' Sentencing Memorandum - 3

## I. PROCEDURAL BACKGROUND

On March 24, 2021, Easterday was charged by information with one count of wire fraud, in violation of Title 18, United States Code, Section 1343. ECF No. 1. On March 30, 2021, Easterday pleaded guilty to the single-count information. ECF No. 12.

## II. EASTERDAY'S OFFENSE CONDUCT

The plea agreement sets out the factual basis for Easterday's guilty plea:

From in or around 2016 through in or around November 2020, Easterday defrauded Tyson Foods, Inc. ("Tyson") of more than $233 million, and he defrauded another company of over $11 million more. ECF No. 10 at 5-9.

Easterday was the president and an owner of Easterday Ranches from at least 1998 through December 2020. Beginning in at least March of 2014, and continuing through 2020, Easterday Ranches entered into a series of Cattle Feeding Agreements with Tyson. Easterday personally signed each of the Cattle Feeding Agreements and extensions of them on behalf of Easterday Ranches. *Id.*

Under the Cattle Feeding Agreements, Easterday Ranches agreed to buy cattle on behalf of Tyson and provide feeding space for the cattle until they were sent for slaughter at Tyson's plant located in Pasco, Washington. Easterday Ranches further agreed to provide Tyson supporting documentation regarding the purchase cost of the cattle that Easterday Ranches proposed buying on behalf of Tyson. Upon approval by Tyson, Easterday Ranches would purchase the cattle, and Tyson agreed to reimburse Easterday Ranches for the purchase costs. *Id.*

Also under the Cattle Feeding Agreements, Tyson agreed to reimburse Easterday Ranches for the costs associated with growing the purchased cattle until they were ready to be slaughtered. Easterday Ranches agreed to seek such reimbursement by billing Tyson twice monthly. Easterday, on behalf of Easterday Ranches, specifically agreed that the bills would accurately reflect the costs associated with growing the cattle. *Id.*

In addition to the Cattle Feeding Agreements between Easterday Ranches and Tyson, Easterday Ranches also entered into a series of livestock bills of sale with

Company 1. As with the Cattle Feeding Agreements, Easterday personally signed each of the livestock bills of sale on behalf of Easterday Ranches. Through these bills of sale, Easterday Ranches agreed to raise cattle on behalf of Company 1 until the cattle were slaughter-ready, using purchase funds and prepaid feed costs advanced by Company 1. Easterday Ranches further agreed that, when the cattle ultimately were sold for slaughter, Easterday Ranches would repay the advanced funds to Company 1, plus 4% interest. *Id.*

Beginning in or around 2016 and continuing through November 2020, Easterday submitted and caused others to submit to Tyson scores of false and fraudulent invoices and other information that sought and obtained reimbursement from Tyson for the cost of purchasing and feeding cattle that did not actually exist. As just one example, on or around May 7, 2020, Easterday caused an employee of Easterday Ranches to email an employee of Tyson, among other things, two false and fraudulent invoices from Easterday Ranches to Tyson. The invoices sought payment for eight lots of cattle that Easterday Ranches purportedly purchased on behalf of Tyson. In truth and fact, none of the eight lots of cattle listed on the invoice was ever actually purchased by or delivered to Easterday or Easterday Ranches. The eight phantom lots totaled 6,312 head of cattle. As a result, in just this one example, Easterday defrauded Tyson of approximately $5,314,326.11 by causing it to pay Easterday Ranches for cattle that simply did not exist. *Id.*

Easterday also submitted and caused to be submitted to Tyson false and fraudulent Cattle Inventory Reports that purported to describe the numerous lots of cattle that Easterday, through Easterday Ranches, purportedly purchased on behalf of Tyson. For example, on or around November 10, 2020, Easterday caused an employee of Easterday Ranches to send Tyson a Cattle Inventory Report that listed the total headcount of "Tyson" cattle as approximately 296,535. Of that number, approximately 263,780 (89%) were identified as having a "Loc" (location) of 99, which was Easterday's secret, internal designation in Easterday Ranches' books and records for

United States' Sentencing Memorandum - 5

1  cattle that—unbeknownst to Tyson—had never actually been purchased by or delivered to Easterday or Easterday Ranches (i.e., the ghost cattle). *Id.*

As a result of Easterday's four-year scheme to defraud, Tyson paid Easterday Ranches a total of approximately $233,008,042 for purchasing and feeding 265,995 ghost cattle. *Id.*

In addition, beginning in or around March 2020, and continuing through in or around September 2020, Easterday submitted and caused others to submit to Company 1 false and fraudulent bills of sale and invoices that sought payment from Company 1 for the purported cost of purchasing and feeding cattle that were never actually purchased by or delivered to Easterday or Easterday Ranches, and that also did not actually exist (i.e., more ghost cattle). *Id.*

In total, as a result of the false and fraudulent representations that Easterday made and caused others to make, Company 1 paid Easterday Ranches approximately $11,023,090 for the purported costs of purchasing and raising thousands of these ghost cattle. *Id.*

Instead of using the vast sums of money he received from Tyson and Company 1 to purchase and feed cattle, Easterday used a significant portion of the proceeds of his fraud to cover approximately $200 million in commodity futures contracts trading losses that Easterday incurred on behalf of Easterday Ranches from in or around 2011 through in or around 2020. *Id.*

### III. EASTERDAY BANKRUPTCY PROCEEDINGS

Shortly after Easterday's massive fraud was uncovered, Easterday Ranches and a related company owned by the defendant, Easterday Farms, Inc., went into bankruptcy. *See In re Easterday Ranches, Inc. et al.*, No. 21-00141-11 (Bankr. E.D. Wa.). Over the course of the following year and a half, the companies and their assets, including large amounts of real property and heavy farm equipment, were liquidated. Easterday assisted in, among other things, this liquidation, as well as with the harvest

United States' Sentencing Memorandum - 6

for Easterday Farms. This assistance helped increase the money raised in the liquidation and sale of crops.

The bankruptcy proceedings were often contentious and always busy. To date, there have been over 1,864 filings. In addition, adversary proceedings were filed by, among others, Easterday Farms and Easterday Ranches against Easterday, his wife, his mother, and the Estate of Easterday's father—over the ownership of certain real estate and related real property. *See* Complaint, *In re Easterday Ranches, Inc.*, No. 21-00141-11 (Bankr. E.D. Wa.) (ECF. No. 1134). Washington Trust Bank also filed an adversary proceeding against the Easterdays based on their alleged default under a $45-million loan that had been taken out in August 2020, just three months before the massive fraud was uncovered. *See* Complaint, *In re Easterday Ranches, Inc.*, No. 21-00141-11 (Bankr. E.D. Wa.) (ECF. No. 559-1).

These adversary and other proceedings have largely been resolved, but not before they caused Tyson, the other corporate victim, other creditors, and the debtors to incur and pay millions of dollars in legal fees. *See, e.g.*, App. for Pmt. of Comp., *In re Easterday Ranches, Inc.*, No. 21-00141-11 (Bankr. E.D. Wa.) (ECF. No. 1845) (showing that over $4 million had already been paid to counsel for the committee of unsecured creditors); App. for Pmt. of Comp., *In re Easterday Ranches, Inc.*, No. 21-00141-11 (Bankr. E.D. Wa.) (ECF. No. 1850) (showing that over $13 million had already been paid to counsel for the debtors).

Moreover, although significant payments were made to creditors of Easterday Ranches and Easterday Farms, including the direct victims of Easterday's fraud, those victims have not been made anywhere near whole. To date, Tyson has received payments totaling approximately $62,417,952 (~27% of what Easterday stole from it), and Company 1 has received approximately $3,492,780 (~32% of what Easterday stole from it).

## IV. GUIDELINES CALCULATION AND RESTITUTION

### A. The Presentence Investigation Report

In the PSR, the United States Probation Office ("USPO") calculated Easterday's total offense level as 32, with a criminal history category I, as follows:

| | | | |
|---|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| Loss Amount: | +26 | U.S.S.G. § 2B1.1(b)(1)(N) |
| Sophisticated Means: | +2 | U.S.S.G. § 2B1.1(10)(C) |
| <u>Acceptance of Responsibility:</u> | <u>-3</u> | U.S.S.G. § 3E1.1 |
| **Total Offense Level:** | **32** | |

PSR ¶ 51. The PSR further calculated Easterday's Criminal History Category as I. *Id.* ¶ 62. As a result, the PSR calculated Easterday's Sentencing Guidelines range to be 121 to 151 months' imprisonment. *Id.* ¶ 98.

In addition, the PSR recommended that the Court order restitution in the total amount of $244,031,132: $233,008,042 to be paid to Tyson; and $11,023,090 to be paid to Company 1. *Id.* ¶¶ 108-09.

### B. The Plea Agreement

As stated in the plea agreement, the United States and Easterday agree that the same Guidelines factors as detailed in the PSR apply to Easterday, and likewise, that Easterday's offense level is 32, after a three-point reduction for acceptance of responsibility. ECF No. 10 at 10-11. The resultant Guidelines range is 121 to 151 months based on Criminal History Category I.

In addition, the parties agreed in the plea agreement that Easterday would pay $244,031,132 in restitution: $233,008,042 to Tyson; and $11,023,090 to Company 1. *Id.* at 11-12.[6]

---

[6] As noted above, this amount would be reduced by any amounts that Easerday's victims have recovered or will recover in the future in the Easterday bankruptcy proceedings on their claims relating to Easterday's fraud.

United States' Sentencing Memorandum - 8

## V. ARGUMENT

The Sentencing Guidelines are advisory. *United States v. Booker*, 543 U.S. 220, 245-46 (2005). However, "the district courts still must consult [the] Guidelines and take them in to account when sentencing[.]" *United States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006) (internal citation and quote omitted). "The appropriate guidelines range, though now calculated under an advisory system, remains the critical starting point for the imposition of a sentence under § 3553(a)." *United States v. Mashek*, 406 F.3d 1012, 1016 n.4 (8th Cir. 2005) (quoted approvingly in *Cantrell*, 433 F.3d at 1279).

Once the Court calculates the defendant's Sentencing Guidelines range, it must then consider the factors set forth in 18 U.S.C. § 3553(a) to decide if they support the sentence recommended by Probation and the parties. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). The applicable sentencing factors under 18 U.S.C. § 3553(a) are: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense, as well as to afford deterrence, protect the public from further crimes of the defendant and provide the defendant training and treatment; (3) the kinds of sentences available; (4) the established Guidelines sentencing ranges; (5) any pertinent Guidelines policy statements; (6) the need to avoid unwarranted sentence disparity between defendants with similar records convicted of similar crimes; and (7) the need to provide restitution to victims of the offense. 18 U.S.C. § 3553(a).

### A. The PSR Accurately Calculates the Applicable Guidelines Range.

Neither the United States nor Easterday has any objections to the PSR. The PSR calculates Easterday's Total Offense Level as 32. PSR ¶ 51. This calculation includes: (a) a base offense level of 7; (b) a 26-level enhancement for losses of more than $150,000,000 but less than $250,000,000; (c) a two-level enhancement because the offense involved sophisticated means; and (d) a three-level reduction for acceptance of

responsibility. *Id*. Easterday's resulting Sentencing Guidelines range is 121 to 151 months' imprisonment. *Id.* ¶ 56.

**B.    The Sentencing Factors of Section 3553(a) Support a Custodial Sentence within the Guidelines Range.**

In this case, the Section 3553(a) factors weigh heavily in favor of a sentence within the applicable Sentencing Guidelines range of 121 to 151 months' imprisonment. Such a sentence would be "sufficient, but not greater than necessary" to comply with the purposes enumerated in 18 U.S.C. § 3553(a)(2), discussed further below.

1.    *Nature and Circumstances of the Offense*

Easterday committed a massive, brazen, long-term fraud that resulted in him successfully stealing nearly a quarter of a billion dollars. The magnitude of Easterday's fraud is so large it is difficult to comprehend. As mentioned earlier, the amount that Easterday stole would have funded Yakima's police department for more than eight years, Yakima's fire department for more than fifteen years, or Yakima's municipal courts for more than 150 years. It would have been sufficient to cover Yakima's combined police, courts, and fire budget – enough to protect a city of nearly 100,000 people – for more than four years.[7] Indeed, the $244 million that Easterday stole would have covered the combined cost of the police forces of Yakima, Spokane, Pasco, Richland, and Kennewick for an entire year—and leave nearly $80 million to spare.[8]

---

[7] *See* City of Yakima 2020 Adopted Budget at 16, 18, *available at* https://www.yakimawa.gov/services/finance/files/ 2020-Adopted-Budget.pdf

[8] *Id.* at 18; City of Spokane 2020 Adopted Budget at 4, available at https://static.spokanecity.org/documents/budget/2020/2020-adopted-budget-full-binder.pdf (showing total police expenditures of $63,653,433); City of Pasco 2019-2020 Budget, *available at* https://egov-pasco.com/weblink/DocView.aspx?id=943146&dbid=0 (showing total police expenditures of $35,524,184); City of Richland

United States' Sentencing Memorandum - 10

1  Put in terms of head of cattle, Easterday's fraud created a mega ghost herd that was
2  more than 2.5 times the population of Yakima: a total of approximately 265,995 ghost
3  cattle.

4  In addition to its sheer size, the fraud perpetrated by Easterday was extremely
5  long-running. Easterday's crime was not a one-time event arising, for example, from a
6  split-second decision. Rather, Easterday's crime was the product of a series of decisions
7  made over the course of more than four years, and it was within his power to stop at any
8  point in time. Instead, Easterday continued to lie to his victims over and over again,
9  submitting false and fraudulent invoices, stealing tens and eventually hundreds of
10 millions of dollars from those who made the mistake of putting their trust in him—all
11 to cover up his reckless and mounting losses trading commodities futures contracts.

12 As described in Tyson's victim impact statement, Tyson put its trust in Easterday,
13 and he betrayed that trust, causing real consequences:

> We put our trust in Easterday Ranches and, more specifically, Cody Easterday, to partner with us to ensure the consistent delivery of beef products to consumers across the Pacific Northwest . . . . Cody Easterday, violated that trust . . . . [Tyson's loss] of approximately $233 million . . . does not include the significant amount Tyson spent on investigating and remediating the full nature and extent of the fraud, which conservatively exceeded $5 million . . . .

---

2020 Budget, *available at* https://www.ci.richland.wa.us/home/showpublished
document/9596/637172727222000000 (showing total police expenditures of
$14,651,400); City of Kennewick 2019-2020 Biennial Budget, *available at* https://
www.go2kennewick.com/ArchiveCenter/ViewFile/Item/734 (showing total police
expenditures of $42,968,000 for two years ($21,484,000 per year)).

United States' Sentencing Memorandum - 11

> Equally important—but perhaps not quite as obvious—Mr. Easterday's actions further impacted Tyson by causing disruption to, and distraction from, its business operations at an incredibly challenging time. As the Court is no doubt aware, the pandemic strained the ability of all food producers to ensure the adequacy of America's food supply. On top of navigating those already challenging issues, Tyson was also forced to deal with a largescale fraud perpetrated against it by one of its trusted cattle suppliers.

Ex. A. The United States respectfully submits that the brazen, extensive, and persistent nature of Easterday's crimes warrants a sentence within the Guidelines range of 121 to 151 months.

    2.  *History and Characteristics of the Defendant*

  Easterday comes before the Court as an individual who has enjoyed a life of extreme privilege. As described in the PSR, his family owned Easterday Farms, a large farming company in southeast Washington State. By 1979, Easterday's parents were the sole owners of Easterday Farms, and, by 1989, Easterday became a partner with his father. At this time, the farm consisted of 1,100 acres with four employees and earned $1,000,000 in gross revenues. The farm continued to grow, and, by 2020, Easterday Farms farmed more than 22,000 acres planted in potatoes, onions, corn, and wheat with 150 employees and earned over $250,000,000 in annual revenue. PSR ¶¶ 84-85.

  In addition, for more than 40 years, cattle operations also occurred on the Easterdays' land, and, in 1997, the Easterdays established Easterday Ranches, a cattle feeding operation. For the last 30 years, cattle had been sold to Tyson, primarily destined for the plant in Pasco. In total, Easterday Ranches has done over $2,000,000,000 in business with Tyson in the last 10 years alone.

  In short, Easterday had every opportunity to succeed in life through legitimate work, and he took advantage of those opportunities.

United States' Sentencing Memorandum - 12

However, when Easterday began experiencing losses trading commodity futures contracts, he did not cover them through legitimate or legal means. He did not admit his mistakes. Instead, Easterday covered up those losses by stealing from the very people who trusted him as a business partner. For years, Easterday lied repeatedly and stole more and more money to cover his ever-growing losses. He turned to serious crime, rather than face the consequences of his mistakes in the commodities market. As discussed above, Easterday could have ended his scheme at any time, but he chose not to do so. Only once Tyson began asking questions about the cattle he had promised to, but did not, purchase did Easterday come clean. *See* PSR at 7 n.2.

Finally, Easterday's post-fraud conduct—which has almost certainly helped increase the value of the assets sold in the Easterday Ranches/Easterday Farms bankruptcy proceedings, and which has undoubtedly saved judicial resources by accepting responsibility early—is commendable. It is appropriate for the Court to take note of both the speed with which Easterday accepted responsibility for his crime once confronted, and his post-fraud efforts to assist with the bankruptcy proceedings. But, these factors do not warrant a variance from the Sentencing Guidelines range. Easterday is likely to receive the benefit of a three-point reduction in his offense conduct for acceptance of responsibility. This three-point reduction would reduce Easterday's Sentencing Guidelines range from what otherwise would have been 168-210 months— a reduction of approximately four to six years. Given Easterday's failure to take advantage of countless earlier opportunities to come clean, a further reduction is not appropriate.

      3.    *Seriousness of the Offense; Promote Respect for the Law; Provide Just Punishment*

A sentence within the Sentencing Guidelines range reflects the seriousness of the offense, promotes respect for the law, and provides a just sentence. Easterday committed a very serious crime—one that involved unabashed fabrications, continued

United States' Sentencing Memorandum - 13

over several years, and eventually culminated in the theft of nearly a quarter of a billion dollars. It necessitates serious punishment.

Indeed, the legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the Act's goals was to rectify the serious problem in the criminal justice system that white-collar offenders were not being adequately punished. See S. Rep. No. 98-225, at 77 (1983) ("[S]ome offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses."). As then Judge Breyer, previously an original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white collar fraud was involved, court granted probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminal who did not receive probation. To mitigate the inequities of these discrepancies, the Commission decided to require short but certain terms of confinement for many white-collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received probation.

See Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 20-21 (1988).

In the same vein, and as noted above, a sentence within the applicable Guidelines range would avoid the appearance of a two-tiered system of justice, in which white-collar defendants are treated more favorably than other defendants. Insofar as one goal of sentencing is to promote respect for the law, it is important for the public to perceive

that a well-heeled defendant who steals nearly a quarter billion dollars through fraud does not receive a more lenient sentence than a defendant who, for instance, distributes 280 grams of crack cocaine. *See* 21 U.S.C. § 841 (imposing a ten-year mandatory minimum).

### 4. *Need to Deter Future Criminal Conduct*

Under Section 3553(a), the need for the sentence to "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), must also be considered. Here, the United States respectfully submits that a sentence within the Guidelines range of 121 to 151 months is necessary to serve this purpose. The enormity and audacity of Easterday's crimes has understandably captured the attention of both the public generally and members of the cattle and farming industries specifically. Thus, the deterrent message and effect of a substantial custodial sentence imposed by the Court in this case will resonate significantly with any individual tempted to engage in white-collar crime like Easterday.

A sentence of 121 to 151 months is appropriate for the further reason that white-collar crime can be seriously affected by the imposition of significant, Guidelines-range sentences. As the United States Court of Appeals for the 11th Circuit has observed, "[d]efendants in white collar [cases] often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). Thus, it is this type of mentality that is most amenable to deterrence. *See, e.g., id.* at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crime are prime candidates for general deterrence." (internal quotation marks and alteration omitted)); *United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997) ("[White collar] crime is not as feared as violent crime or drug offenses, but like the latter it requires heavy sentences to deter because it is potentially very lucrative.").

A significant sentence of imprisonment—one that falls within the Sentencing Guidelines range—will help ensure that others know that fraud will result in more than a repayment order or fine, but rather will result in a meaningful, predictable prison term.

Such deterrence is needed both in society as a whole and in the United States' food industry. As Tyson points out in its victim impact statement:

> In fashioning an appropriate sentence for Mr. Easterday, we encourage the Court to not only consider the extensive nature of the fraudulent scheme and its financial impact on Tyson, but also, the broader implications of Mr. Easterday's conduct on the integrity of the nation's food supply chain. Beef products are a critical foodstuff for American consumers that require a robust and reliable supply chain to come to market. Dishonest and fraudulent conduct like that perpetrated by Mr. Easterday undermines the reliability of the food supply chain and threatens the delivery of quality, affordable products to the tables of American consumers. American consumers deserve better. Ex. A.

    5.    *Need to Avoid Unwarranted Disparities*

Under 18 U.S.C. § 3553(a)(7), the Court should consider the "need to avoid unwarranted sentencing disparities." The Sentencing Guidelines have taken into account the relevant factors and are in and of themselves a means to avoid unwarranted sentencing disparities.

Indeed, the United States' recommendation of a sentence within the Guidelines range of 121 to 151 months is based, in part, on the fact that such a sentence properly reflects the accumulated wisdom and expertise of the Sentencing Commission. Anchoring the sentence to the Guidelines range also serves the vital goal of uniformity and fairness in sentencing. To be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552

U.S. 85, 90 (2007). Nevertheless, it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Id*. at 108-09 (internal quotation marks omitted).

Furthermore, the Guidelines are often the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in creating the Sentencing Commission in the first place.

The United States therefore submits that a custodial sentence within the Guidelines range of 121 to 151 months is appropriate.

### C. The Court Should Not Impose a Fine

The United States agrees with the PSR's recommendation that no fine be imposed because, given the amount of restitution, the imposition of a fine would serve only to impede any payments on that large amount owed to the victims. *See* PSR ¶ 96.

## VI. CONCLUSION

For the foregoing reasons, the United States respectfully submits that the sentence it has requested is sufficient, but not greater than necessary, to provide just punishment to Easterday for his crime, promote respect for the law, and deter the defendant and others from committing similar crimes in the future. *See* 18 U.S.C. § 3553(a). The United States thus recommends that the Court sentence the defendant to a custodial sentence within the Guidelines range of 121 to 151 months and a term of supervised release of three years. The Court should further impose a $100 special assessment, and it should order Easterday to pay restitution in the amount of $244,031,132, of which $233,008,042 should be paid to Tyson, and $11,023,090 should be paid to Company 1. These restitution amounts should be reduced by any amounts that the victims recover in the Easterday Ranches/Easterday Farms bankruptcy proceedings on their claims relating to Easterday's fraud.

Respectfully submitted this 19th day of September 2022.

| | |
|---|---|
| GLENN S. LEON<br>CHIEF, FRAUD SECTION<br>CRIMINAL DIVISION<br>U.S. DEPARTMENT OF JUSTICE | VANESSA R. WALDREF<br>UNITED STATES ATTORNEY |
| By: *John ("Fritz") Scanlon*<br>Avi Perry<br>Deputy Chief<br>John ("Fritz") Scanlon<br>Assistant Chief<br>1400 New York Avenue NW<br>Washington, DC 20005<br>Telephone: (202) 304-2946 | by: *Russell E. Smoot*<br>Russell E. Smoot<br>Timothy M. Durkin<br>Brian M. Donovan<br>Assistant United States Attorneys<br>Post Office Box 1494<br>Spokane, WA 99210-1494<br>Telephone: (509) 353-2767 |

**CERTIFICATE OF SERVICE**

I hereby certify that on the date indicated herein, I caused a true and correct copy of the foregoing to be filed with the Clerk of Court using the CM/ECF System, which will send notification of such to all attorneys of record.

<u>John ("Fritz") Scanlon</u>
John ("Fritz") Scanlon
Assistant Chief, Fraud Section
Criminal Division
U.S. Department of Justice