| | |
|---|---|
| Glenn S. Leon | Vanessa R. Waldref |
| Chief, Fraud Section | United States Attorney |
| U.S. Department of Justice | Eastern District of Washington |
| Avi Perry | Russell E. Smoot |
| Deputy Chief | Timothy M. Durkin |
| John ("Fritz") Scanlon | Brian M. Donovan |
| Assistant Chief | Assistant United States Attorneys |
| 1400 New York Avenue NW | Post Office Box 1494 |
| Washington, DC 20005 | Spokane, WA 99210-1494 |
| Telephone: (202) 304-2946 | Telephone: (509) 353-2767 |

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CODY ALLEN EASTERDAY,<br><br>Defendant. | No. 4:21-CR-06012-SAB-1<br><br>**UNITED STATES' RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE** |

Plaintiff, the United States of America, by and through Glenn S. Leon, Chief, Fraud Section, Criminal Division, United States Department of Justice, Avi Perry, Deputy Chief, Fraud Section, Criminal Division, United States Department of Justice, John ("Fritz") Scanlon, Assistant Chief, Fraud Section, Criminal Division, United States Department of Justice, Vanessa R. Waldref, United States Attorney for the Eastern District of Washington, and Russell E. Smoot, Timothy M. Durkin, and Brian M. Donovan, Assistant United States Attorneys for the Eastern District of Washington (collectively, "the United States"), hereby submits this response to Defendant Cody

United States' Response to Defendant's Sentencing Memorandum and Motion for Downward Variance - 1

Allen Easterday's "Sentencing Memorandum and Motion for Downward Variance," ECF No. 50, and states as follows:

The United States opposes Easterday's motion for downward variance, and, as set forth in the United States' Sentencing Memorandum and below, the United States believes that a custodial sentence within the applicable Guidelines range of 121 to 151 months is appropriate. Easterday's fraud was of staggering magnitude, lasted for four years, and involved repeated, brazen lies to those who had the misfortune of trusting him as a business partner. A crime of this duration and size demands a significant custodial sentence. A Guidelines sentence would satisfy that demand.

Easterday's request that the Court impose a probation sentence for one of the largest thefts in Washington history should be rejected out of hand. In seeking such a slap on the wrist, Easterday asks the Court to (i) completely ignore the magnitude of his theft and the Guidelines range that results from it, (ii) focus instead on Easterday's alleged gambling addiction, and (iii) give Easterday out-sized credit for admitting his wrongdoing early and helping with the orderly liquidation of Easterday Ranches and Easterday Farms. *See* ECF No. 50. The Court should decline these requests.

First, the Sentencing Guidelines were adopted by experts to guide courts in their sentences and are often the sole means available for assuring some measure of uniformity in sentencing. The Guidelines should not simply be ignored. Indeed, no authorities cited by Easterday come close to supporting his request to scrap the Guidelines entirely and vary down from a significant sentence of 121 to 151 months' imprisonment to not a single day in jail.

Second, Easterday's gambling addiction was diagnosed only after he was caught and by health care professionals who met with Easterday and his family for short periods of time—and thus should be viewed skeptically. Even more critical, however, is the fact that Easterday stole far more money from his victims ($244 million) than he lost trading commodities futures contracts (approximately $200 million). His addiction

United States' Response to Defendant's Sentencing Memorandum and Motion for Downward Variance - 2

to gambling provides no basis for stealing nearly $45 million more than he lost. That extra $45 million at the very least helped continue his lifestyle as the scion of a rich and powerful ranching and farming family in southeast Washington state—and the benefits that went along with it.

Third, Easterday's early admission of his wrongdoing, prompt signing of a plea agreement, and assistance with the orderly liquidation of Easterday Ranches and Easterday Farms has already been taken into account in the calculation of his Guidelines range. As explained in the United States' Sentencing Memorandum, it reduced his Guidelines range from 168-210 months to 121-151 months—a reduction of approximately four to six years. Moreover, Easterday's level of acceptance is belied by repeated references in his sentencing submission of his supposed voluntary self-disclosure of wrongdoing to Tyson. In truth and fact, Tyson was investigating Easterday's inventory of cattle, and Easterday had little other option than to tell the truth. The cattle did not exist, and Tyson was about to find out. Easterday therefore deserves credit, but not undue credit, for his post-fraud acceptance of responsibility and assistance in increasing the value of his family's companies.

I. **ARGUMENT**

  A.   **The Sentencing Guidelines Should Be Followed Not Disregarded.**

As explained in the United States' Sentencing Memorandum, the Sentencing Guidelines provide a suitable range of incarceration for Easterday and should be followed. This conclusion is supported by an examination of the relevant Section 3553(a) factors, which weigh heavily in support of a sentence of 121 to 151 months. The fraud was staggeringly large, lasted for years, and involved repeated lies to business partners who wrongly placed their trust in Easterday. *See* ECF No. 49 at 10-13. In addition, the enormity and audacity of Easterday's crimes has captured the attention of both the public generally and members of the cattle and farming industries specifically. Thus, the deterrent message and effect of a substantial custodial sentence imposed by

United States' Response to Defendant's Sentencing Memorandum and Motion for Downward Variance - 3

the Court in this case will resonate significantly with any individual tempted to engage in crime similar to Easterday's. *Id.* at 10-16. Finally, a Guidelines sentence would avoid sentencing disparities, as the Guidelines reflect the accumulated wisdom of the Sentencing Commission, provide a level of uniformity to sentencing, and help assure that well-heeled white-collar criminals like Easterday are meaningfully punished for their crimes, especially one involving the theft of $244 million.

Easterday is wrong in arguing that the Court should simply disregard the Sentencing Guidelines and impose a sentence of zero months' imprisonment because the enhancement for loss under Section 2B1.1 is "unwarranted for Mr. Easterday." *See* ECF No. 50 at 13-18. None of the decisions Easterday cites supports such a bold contention. The primary decision relied upon by Easterday, *United States v. Parris*, deals with the separate and inapplicable issue of piling on multiple enhancements for officers of publicly traded companies who are convicted of securities fraud. *See* 573 F. Supp. 2d 744, 745-50 (E.D.N.Y. 2008). More importantly, *Parris* actually supports a sentence of 121 to 151 months for Easterday, not his proposed sentence of zero months. In *Parris*, the court ordered the parties to submit examples of securities fraud cases from across the nation, and it concluded that defendants who were responsible for losses of over $100 million dollars were generally sentenced to double-digit (in years) prison terms:

> [I]t was perfectly clear that there was a correlation between the losses in those cases and the periods of incarceration: Those who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); those whose losses were less than $100 million were generally sentenced to single-digit terms. *Id.* at 753.

Moreover, only one of the other decisions cited by Easterday resulted in a probation sentence, and the issue motivating the court in that situation was the fact that

United States' Response to Defendant's Sentencing Memorandum and Motion for Downward Variance - 4

1. the intended loss far exceeded the actual loss, thus overstating the defendant's culpability. *See United States v. Edwards*, 595 F.3d 1004, 1010 (9th Cir. 2010). Here, the intended loss and actual loss were the same: a staggering $244 million. The other decisions cited by Easterday all resulted in significant prison sentences and involved mitigating factors going far beyond loss amount. *See, e.g.*, *Parris*, 573 F. Supp. 2d at 745 (60 months); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (noting, in a pre-*Booker* decision, that the court would have sentenced the defendant to 24 months' imprisonment, rather than the 33 months set forth in the Guidelines). Significantly, none of the decisions cited by Easterday stands for the proposition that courts should completely disregard loss amounts when fashioning a sentence, as Easterday contends here.

### B. Easterday's Alleged Gambling Addiction Does Not Warrant a Variance.

The Court should reject Easterday's contention that his recently diagnosed gambling addiction warrants a reduction in his sentence from a Guidelines Range of 121-151 months' imprisonment to not a single day in jail. The expert opinions upon which he relies should be viewed skeptically, and none even attempts to explain how a gambling addiction could excuse stealing $44 million more than Easterday lost in his reckless trading of commodities futures contracts.

One of the three experts whose reports are attached to Easterday's Sentencing Memorandum—Deena Mason, LMCH, NCC, M.Ed.—does not actually include any specific finding that Easterday's alleged gambling addiction caused Easterday to commit the crimes charged. Ms. Mason's only discussion of Easterday's trading activity erroneously states that he was trading "stocks" and says that he "grew obsessed with it" and "had difficulty focusing on anything else as he continued to trade, especially when he began experiencing large losses." Ms. Mason then goes on to state that Easterday's depression, not gambling disorder, "intensified, and he found himself in a

desperate place." Ms. Mason's discussion of Easterday's trading then concludes with a mischaracterization of Easterday's conduct as "borrowing" from Tyson, when, in truth and fact, Easterday was stealing on a massive scale: "He found himself chasing the losses, and lying to himself that it would be okay to borrow from Tyson Foods." *See* ECF No. 58 at 32. Such an opinion does not warrant any variance based on alleged gambling addiction, let alone the massive variance sought by Easterday.

The other two experts whose reports are attached to Easterday's Sentencing Memorandum met with Easterday in person for three hours or less—an extremely short period of time to form their opinions that Easterday's gambling addiction is the motivating cause of his crimes. Alexander L. Patterson, Psy. D., explains that the sources of information for his opinion consist of (i) one clinical interview of Easterday that lasted for approximately 180 minutes, (ii) one phone conversation each with Mr. Easterday's wife and sister, each for an unknown duration, (iii) a follow-up phone conversation with Easterday of unspecified duration, (iv) a phone conversation with Ms. Mason of unspecified duration, (v) the Information and Plea Agreement in this case, and (vi) an analysis of that information on three psychological test. *See* ECF No. 58 at 2. Based on these brief interactions, Mr. Patterson provides the definitive opinion that "Mr. Easterday's criminal actions were the direct product of a gambling disorder which developed out of a complex combination of personality and environmental factors." *Id.* at 18. Mr. Patterson further opines that "[t]he nature of his gambling disorder makes it easy to treat, and he is a very low risk of relapse." *Id.* at 19. The United States submits that these opinions should be viewed skeptically. They are based on a small amount of information and interactions with Easterday himself, and they are extremely convenient for the situation in which Easterday finds himself: explaining the reasons for past criminal conduct while assuring that it will not happen again.

The same is true for the opinion of Jon E. Grant, M.D., J.D. Indeed, Mr. Grant reached his definitive opinions about Easterday based on even less information: a single,

90-minute interview. *See* ECF No. 58 at 22. Despite this brief interaction, Mr. Grant, like Mr. Patterson, was able to opine that Easterday's criminal conduct was motivated by a gambling disorder and that it can be easily treated (by continuing the counseling Easterday is currently receiving from Ms. Mason). *Id.* at 25. Mr. Grant's opinion, like Mr. Patterson's opinion, should be viewed skeptically.

Finally, and critically, the expert opinions make no mention whatsoever of how Easterday's alleged addiction to gambling in the commodities futures markets could explain his theft of approximately $44 million more than what he gambled away. No dispute exists over the fact that Easterday's trading losses were approximately $200 over the period from 2011 through 2020, and that his scheme to defraud resulted in him successfully stealing $244 million in just the 2016-2020 period alone. *See* ECF No. 10 at 6-9. This extreme excess in theft vis-à-vis "gambling" losses shows that Easterday was motivated by more than simply covering his commodities futures trading debts. This large surplus of fraud proceeds went into Easterday Ranches' accounts. It fed the Easterday family empire that Easterday led—an empire that, by 2020, included more than 22,000 acres of farmland, 150 employees, revenues of over $250,000,000, and even a private plane and hangar. *See* PSR ¶¶ 84-85; Notice & App., *In re Easterday Ranches, Inc.*, No. 21-00141-11 (Bankr. E.D. Wa.) (ECF. No. 675) (application to retain J&D Aircraft Sales, LLC, to sell Easterday Farms' "Beechcraft King Air C90 turbojet aircraft," "a fractional interest in an aircraft hangar at the Tri-Cities Airport in Pasco, Washington," "aircraft tugs, and related equipment and other assets"). Easterday's repeated contention that the fraud was not committed to fund a lavish lifestyle is therefore misleading. The fraud, at least in part, strengthened his family's companies—which Easterday largely owned—and solidified Easterday as a pillar of his community.

Easterday's alleged gambling addiction therefore serves as no basis whatsoever for a variance, let alone a variance to no prison time.

### C. Easterday's Acceptance of Responsibility and Assistance in Increasing the Value of His Family's Businesses Does Not Warrant a Variance.

As explained in the United States' Sentencing Memorandum, Easterday's post-fraud conduct—which has almost certainly helped increase the value of his company's assets liquidated in the bankruptcy, and which has undoubtedly saved judicial resources by accepting responsibility early—is commendable. But, these factors do not warrant a variance from the Sentencing Guidelines range. Easterday is likely to receive the benefit of a three-point adjustment in his offense conduct for acceptance of responsibility. This adjustment equates to a reduction in his Sentencing Guidelines range of approximately four to six years (from 168-210 months to 121-151 months). Given Easterday's failure to take advantage of countless earlier opportunities to come clean, a further reduction is not appropriate. *See* ECF No. 49 at 3, 13.

A variance based on Easterday's post-fraud conduct is particularly inappropriate here, where Easterday's acceptance and atonement are not extraordinary. Indeed, Easterday's arguments on this subject rely heavily on suggestions and assertions that Easterday disclosed his wrongdoing to Tyson out of a crisis of conscience. *See, e.g.*, ECF No. 50 at 3 ("Cody kept a record of his fraudulent activity and in 2020 *self disclosed his fraud to Tyson officials*.") (emphasis added); *id.* at 10 ("During a meeting with Tyson representatives on or about November 30, 2020, *Mr. Easterday self-disclosed to Tyson that 'the reported cattle he listed in inventory were 'not there*.'") (emphasis added); *id.* at 19 ("As indicated above, Mr. Easterday maintained a separate account that accurately documented the amounts and details of the fraudulent transactions and *voluntarily disclosed his fraud to Tyson*.") (emphasis added); ECF No. 58 at 10 ("In the fall of 2020, his losses 'started escalating' and he 'came to realization this was getting out of hand.' He 'couldn't take holding the lies back no more' and decided 'I need to do the right thing here and try being honest and try working my way

United States' Response to Defendant's Sentencing Memorandum and Motion for Downward Variance - 8

out of this thing, with the proper method.'"). These assertions are perhaps nowhere more explicit than in the expert opinion of Ms. Mason:

> Cody considers himself to be an honest person so with the best intentions he began to borrow money from Tyson Foods. Cody had planned to fix the problem and pay them back, but as time went by, the losses grew larger and larger, so he borrowed more and more money, until he found he could not live with what he was doing. As a result, he reported his activities to his wife, and Tyson Foods while still hoping to have a chance to fix the problem. He was having a terrible internal battle, as his strong sense of being honest, and his commitment to keep his family, and the farm's finances stable, weren't lining up. Eventually Cody could not live with himself as it went against his deep-rooted morals and his internal values. *Id.* at 33.

But these assertions are not true. Easterday disclosed his crimes to Tyson because Tyson was on the verge of discovering them itself. As explained by the Senior Vice President for Beef Margin Management at Tyson fresh Meats, Inc., "[i]n the fall of 2020, [Tyson] began looking more closely at the level of capital investment it had made in its cattle procurement operations." That investigation showed that Easterday had an inventory of over $300 million, and therefore, in mid-November, Tyson personnel began investigating that inventory and "where the cattle were located." Ex. A, Decl. of Kevin Hueser, dated January 25, 2021. It was this investigation, not Easterday's conscience, that led Easterday to disclose the fraud. Easterday had few options. The cattle did not exist, and Tyson was about to find out.

Easterday therefore deserves the credit he has already received, not a variance, for his post-fraud acceptance of responsibility and assistance in increasing the value of his family's companies.

## II. CONCLUSION

For the foregoing reasons, and for the reasons set forth in the United States' Sentencing Memorandum, the United States respectfully submits that Easterday's motion for a downward variance should be denied and that the Court should impose a Guidelines Range sentence of 121 to 151 months' imprisonment. Such a sentence is sufficient, but not greater than necessary, to provide just punishment to Easterday for his crime, promote respect for the law, and deter the defendant and others from committing similar crimes in the future.

Respectfully submitted this 26th day of September 2022.

| | |
|---|---|
| GLENN S. LEON<br>CHIEF, FRAUD SECTION<br>CRIMINAL DIVISION<br>U.S. DEPARTMENT OF JUSTICE | VANESSA R. WALDREF<br>UNITED STATES ATTORNEY |
| By: *John ("Fritz") Scanlon*<br>Avi Perry<br>Deputy Chief<br>John ("Fritz") Scanlon<br>Assistant Chief<br>1400 New York Avenue NW<br>Washington, DC 20005<br>Telephone: (202) 304-2946 | by: *Russell E. Smoot*<br>Russell E. Smoot<br>Timothy M. Durkin<br>Brian M. Donovan<br>Assistant United States Attorneys<br>Post Office Box 1494<br>Spokane, WA 99210-1494<br>Telephone: (509) 353-2767 |

## CERTIFICATE OF SERVICE

I hereby certify that on the date indicated herein, I caused a true and correct copy of the foregoing to be filed with the Clerk of Court using the CM/ECF System, which will send notification of such to all attorneys of record.

<u>John ("Fritz") Scanlon</u>
John ("Fritz") Scanlon
Assistant Chief, Fraud Section
Criminal Division
U.S. Department of Justice