Glenn S. Leon
Chief, Fraud Section
U.S. Department of Justice
John ("Fritz") Scanlon
Assistant Chief
1400 New York Avenue NW
Washington, DC 20005
Telephone: (202) 304-2946

Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Ian Garriques
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CODY ALLEN EASTERDAY,<br><br>Defendant. | Case No. 4:21-CR-06012-SAB<br><br>**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR A SENTENCE REDUCTION UNDER 18 U.S.C. § 3582(c)(2)** |

Plaintiff, the United States of America, by and through Glenn S. Leon, Chief, Fraud Section, Criminal Division, United States Department of Justice, John ("Fritz") Scanlon, Assistant Chief, Fraud Section, Criminal Division, United States Department of Justice, Vanessa R. Waldref, United States Attorney for the Eastern District of Washington, and Ian Garriques, Assistant United States Attorney for the Eastern District of Washington (collectively, "the United States"), hereby submits this response to Defendant's Motion for a Sentence Reduction Under 18 U.S.C. § 3582(c)(2), (the "Motion"), ECF No. 107, and states as follows:

The United States opposes Easterday's Motion because, even though the defendant is eligible for a two-point reduction in his offense level, a sentence at the low-end of the amended guideline range would be wholly insufficient, in light of the factors set forth in 18 U.S.C. § 3553(a)(2). As explained in the United States' Sentencing

Memo and at the sentencing hearing, ECF Nos. 49 & 89, the sheer magnitude of Easterday's fraud is staggering. Indeed, this Court noted that "[i]t's the biggest theft or fraud that I've seen in my career as a judge, probably the biggest I will see. I hope so, anyway." ECF No. 89 at 52:20-22. Easterday stole nearly a quarter of a billion dollars over the four-year period from 2016 through November 2020. He did so by manufacturing scores of false and fraudulent invoices and other information that he used to conceal the fact that, instead of purchasing over 265,000 head of cattle, Easterday used the $244 million his victims entrusted him with to cover huge losses Easterday had incurred in the commodities futures market and to shore up the finances of Easterday's company.

To be sure, Easterday has taken responsibility for his actions, helped raise money to pay his creditors, and has acquitted himself well in prison. But such conduct does not excuse the more than four years of dishonesty and sheer magnitude of his fraud, and it certainly does not warrant a reduction in his sentence of more than 25%. Rather, the maximum amount by which this Court should reduce Easterday's sentence is 11 months, which would result in a sentence at the high end of the amended guideline range (and the low end of the original guideline range): 121 months. Such a sentence would be sufficient, but not greater than necessary, to provide just punishment in this case, promote respect for the law, and deter others from committing similar, massive crimes in the future.

I.      **PROCEDURAL BACKGROUND**

On March 24, 2021, Easterday was charged by information with one count of wire fraud, in violation of Title 18, United States Code, Section 1343. ECF No. 1. On March 30, 2021, Easterday pleaded guilty to the single-count information. ECF No. 12.

On October 4, 2022, the Court sentenced Easterday to 132 months' imprisonment. In so doing, the Court first adopted the total offense level recommended by the U.S. Probation Office ("USPO") and by the parties' plea agreement: 32. Under the U.S. Sentencing Guidelines ("USSG") then in effect, Easterday's guideline range

was 121 to 151 months' imprisonment. The Court thus imposed a mid-range sentence after noting, among other things, the magnitude and brazenness of the fraud. *See* ECF No. 89 at 50-58.

On January 17, 2024, the USPO informed this Court that Easterday qualifies for a two-point reduction in his offense level pursuant to USSG § 4C1.1(a) and Amendment 821. Under this revised offense level, Easterday's guideline range is 97 to 121 months' imprisonment. ECF No. 105.

On January 31, 2024, Easterday filed his Motion, which requests that the Court reduce Easterday's sentence by approximately 26.5%—from 132 months in prison to just 97. ECF No. 107.

## II.    FACTUAL BACKGROUND

From 2016 through 2020, Easterday defrauded Tyson Foods, Inc. ("Tyson") of more than $233 million, and he defrauded another company of over $11 million more. ECF No. 10 at 5-9.

Easterday was the president and an owner of Easterday Ranches from at least 1998 through December 2020. Under Cattle Feeding Agreements that Easterday entered into on behalf of his company, Easterday agreed that his ranch would buy cattle for Tyson and provide feeding space for the cattle until they were sent for slaughter at Tyson's plant located in Pasco, Washington. Easterday further agreed to provide Tyson supporting documentation regarding the purchase cost of the cattle that Easterday Ranches proposed buying on behalf of Tyson. Upon approval by Tyson, Easterday Ranches would purchase the cattle, and Tyson agreed to reimburse Easterday Ranches for the purchase costs. *Id.*

Also under the Cattle Feeding Agreements, Tyson agreed to reimburse Easterday Ranches for the costs associated with growing the purchased cattle until they were ready to be slaughtered. Easterday Ranches agreed to seek such reimbursement by billing Tyson twice monthly. Easterday, on behalf of Easterday Ranches, specifically agreed that the bills would accurately reflect the costs associated with growing the cattle. *Id.*

In addition to the Cattle Feeding Agreements between Easterday Ranches and Tyson, Easterday also entered into a series of livestock bills of sale with Company 1. As with the Cattle Feeding Agreements, Easterday personally signed each of the livestock bills of sale on behalf of Easterday Ranches. Through these bills of sale, Easterday Ranches agreed to raise cattle on behalf of Company 1 until the cattle were slaughter-ready, using purchase funds and prepaid feed costs advanced by Company 1. Easterday Ranches further agreed that, when the cattle ultimately were sold for slaughter, Easterday Ranches would repay the advanced funds to Company l, plus 4% interest. *Id.*

Beginning in or around 2016 and continuing through November 2020, Easterday submitted and caused others to submit to Tyson scores of false and fraudulent invoices and other information that sought and obtained reimbursement from Tyson for the cost of purchasing and feeding cattle that did not actually exist. As just one example, on or about May 7, 2020, Easterday caused an employee of Easterday Ranches to email an employee of Tyson, among other things, two false and fraudulent invoices from Easterday Ranches to Tyson. The invoices sought payment for eight lots of cattle that Easterday Ranches purportedly purchased on behalf of Tyson. In truth and fact, none of the eight lots of cattle listed on the invoice was ever actually purchased by or delivered to Easterday or Easterday Ranches. The eight phantom lots totaled 6,312 head of cattle. As a result, in just this one example, Easterday defrauded Tyson of approximately $5,314,326.11 by causing it to pay Easterday Ranches for cattle that simply did not exist. *Id.*

Easterday also submitted and caused to be submitted to Tyson false and fraudulent Cattle Inventory Reports that purported to describe the numerous lots of cattle that Easterday, through Easterday Ranches, purportedly purchased on behalf of Tyson. For example, on or around November 10, 2020, Easterday caused an employee of Easterday Ranches to send Tyson a Cattle Inventory Report that listed the total headcount of "Tyson" cattle as approximately 296,535. Of that number, approximately

263,780 (89%) were identified as having a "Loc" (location) of 99, which was Easterday's secret, internal designation in Easterday Ranches' books and records for cattle that—unbeknownst to Tyson—had never actually been purchased by or delivered to Easterday or Easterday Ranches (i.e., the ghost cattle). *Id.*

As a result of Easterday's four-year scheme to defraud, Tyson paid Easterday Ranches a total of approximately $233,008,042 for purchasing and feeding 265,995 ghost cattle. *Id.*

In addition, beginning in or around March 2020, and continuing through in or around September 2020, Easterday submitted and caused others to submit to Company 1 false and fraudulent bills of sale and invoices that sought payment from Company 1 for the purported cost of purchasing and feeding cattle that were never actually purchased by or delivered to Easterday or Easterday Ranches, and that also did not actually exist (i.e., more ghost cattle). *Id.*

In total, as a result of the false and fraudulent representations that Easterday made and caused others to make, Company 1 paid Easterday Ranches approximately $11,023,090 for the purported costs of purchasing and raising thousands of these ghost cattle. *Id.*

Instead of using the vast sums of money he received from Tyson and Company 1 to purchase and feed cattle, Easterday used a significant portion of the proceeds of his fraud to cover approximately $200 million in commodity futures contracts trading losses that Easterday incurred on behalf of Easterday Ranches from in or around 2011 through in or around 2020. *Id.* The remaining $44 million went into the accounts of Easterday Ranches. ECF No. 89 at 8:16-9:5.

### III. LEGAL STANDARD

In Part B, Subpart 1 to Amendment 821 to the Sentencing Guidelines, the Sentencing Commission added what now appears in Section 4A1.1(c), providing a 2-offense-level reduction for many offenders who present zero criminal history points.

On August 24, 2023, the Commission decreed that this change applies retroactively. *See* § 1B1.10(e)(2) (Nov. 1, 2023).

In *Dillon v. United States*, 560 U.S. 817 (2010), the Supreme Court addressed the process for application of a retroactive guideline amendment, emphasizing that Section 1B1.10 is binding. The Court declared: "Any reduction must be consistent with applicable policy statements issued by the Sentencing Commission." *Id.* at 821. The Court required district courts to follow a two-step approach:

> At step one, § 3582(c)(2) requires the court to follow the Commission's instructions in §1B1.10 to determine the prisoner's eligibility for a sentence modification and the extent of the reduction authorized. Specifically, §1B1.10(b)(1) requires the court to begin by "determin[ing] the amended guideline range that would have been applicable to the defendant" had the relevant amendment been in effect at the time of the initial sentencing . . . . Consistent with the limited nature of § 3582(c)(2) proceedings, §1B1.10(b)(2) also confines the extent of the reduction authorized. Courts generally may "not reduce the defendant's term of imprisonment under 18 U.S.C. § 3582(c)(2) . . . to a term that is less than the minimum of the amended guideline range" produced by the substitution. §1B1.10(b)(2)(A) . . . .
>
> At step two of the inquiry, § 3582(c)(2) instructs a court to consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by reference to the policies relevant at step one is warranted in whole or in part under the particular circumstances of the case.

*Dillon*, 560 U.S. at 827.

Subject to the limits set forth in Section 1B1.10(b), the Court may consider all pertinent information in applying the Section 3553(a) factors and determining whether and by how much to reduce the defendant's sentence. Thus, "[t]he grant of authority to the district court to reduce a term of imprisonment is unambiguously discretionary," even when the guideline range is actually reduced. *United States v. Vautier*, 144 F.3d 756, 760 (11th Cir. 1998). A district court has "substantial discretion" in deciding whether to reduce a sentence; even "[a]n agreement between the government and the defendant that a sentence reduction is appropriate does not bind the judge; nor is the judge's consideration of the question limited to the factors the parties regard as relevant." *United States v. Young*, 555 F.3d 611, 614 (7th Cir. 2009).

Accordingly, many courts have denied sentence reductions in situations where guideline amendments lowered the sentencing ranges. *See, e.g., United States v. Wilson*, 716 F.3d 50, 53 (2d Cir. 2013) (denial of sentence reduction was not an abuse of discretion, though earlier sentence reduction had been granted despite defendant's prison misconduct, and defendant had not engaged in any new prison misconduct); *United States v. Styer*, 573 F.3d 151, 154-55 (3d Cir. 2009) (denial based on nature of original criminal conduct); *United States v. Melton*, 2008 WL 1787045 (W.D.N.C. 2008) (denial based on nature of offense); *United States v. Craig*, 2008 WL 1775263 (W.D.N.C. 2008) (denial based on the facts of the case); *United States v. Suell*, 2008 WL 2845295 (N.D. Tex. 2008) (motion denied because defendant benefitted from a favorable plea agreement in which charges were dismissed and the sentence was reduced); *United States v. Sifford*, 2008 WL 2048387 (W.D.N.C. 2008) (in exercise of the court's discretion, it affords only a partial reduction, in light of the defendant's record), *aff'd*, 309 F. App'x 705 (4th Cir. 2009). *See also United States v. Marion*, 293 F. App'x 731 (11th Cir. 2008) (district court's consideration of the defendant's criminal history was proper, when denying a reduction motion, even though this was the same factor it considered at his original sentencing hearing).

## IV. ARGUMENT

As noted above, the United States agrees at step one that Easterday is eligible for relief under the amendment. Turning to step two, however, the United States disagrees that the section 3553(a) factors weigh in favor of reducing Easterday's sentence by 26.5%, all the way from 132 months to just 97 months in prison. To the contrary, the section 3553(a) factors weigh heavily in favor of a sentence at the top end of the amended guideline range of 97 to 121 months' imprisonment. Such a sentence would be "sufficient, but not greater than necessary" to comply with the purposes enumerated in 18 U.S.C. § 3553(a)(2), discussed further below.

### 1. *Nature and Circumstances of the Offense*

Easterday committed a massive, brazen, long-term fraud that resulted in him successfully stealing nearly a quarter of a billion dollars. The magnitude of Easterday's fraud is so large it is difficult to comprehend. Indeed, this Court noted that "[i]t's the biggest theft or fraud that I've seen in my career as a judge, probably the biggest I will see. I hope so, anyway." ECF No. 89 at 52:20-22. In dollar terms, the amount that Easterday stole would have covered Yakima's combined police, courts, and fire budget – enough to protect a city of nearly 100,000 people – for more than four years.[1] In terms of head of cattle, Easterday's fraud created a mega ghost herd that was more than 2.5 times the population of Yakima: a total of approximately 265,995 ghost cattle.

In addition to its sheer size, the fraud perpetrated by Easterday was extremely long-running and brazen. It was the product of a series of decisions made over the course of more than four years, and it was within his power to stop at any point in time. Instead, Easterday continued to lie to his victims over and over again, submitting false and fraudulent invoices, stealing tens and eventually hundreds of millions of dollars

---

[1] *See* City of Yakima 2020 Adopted Budget at 16, 18, *available at*

https://www.yakimawa.gov/services/finance/files/ 2020-Adopted-Budget.pdf

from those who made the mistake of putting their trust in him—all to cover up his reckless and mounting losses trading commodities futures contracts.

Moreover, as explained by the United States at the sentencing hearing, Easterday stole far more than he lost in the commodities futures markets. His losses totaled approximately $200 million, but he defrauded his victims of over $244 million. *See* ECF No. 10 at 8-9. The remaining $44 million went into the accounts of Easterday Ranches to shore up its finances and prolong Easterday's status as an elite businessman in the community. ECF No. 89 at 8:16-9:5. Easterday could have come clean at any point, but he did not. He instead committed fraud on a massive scale.

The United States respectfully submits that the brazen, extensive, and persistent nature of Easterday's crimes warrants a sentence at least at the high end of the amended guideline range of 97 to 121 months.

        2.     *History and Characteristics of the Defendant*

Prior to his incarceration, Easterday enjoyed a life of extreme privilege. His family owned Easterday Farms, a large farming company in southeast Washington State, and they also owned Easterday Ranches, a large cattle feeding operation. In short, Easterday had every opportunity to succeed in life through legitimate work, and he took advantage of those opportunities.

However, when Easterday began experiencing losses trading commodity futures contracts, he did not cover them through legitimate or legal means. He did not admit his mistakes. Instead, Easterday covered up those losses by stealing from the very people who trusted him as a business partner. For years, Easterday lied repeatedly and stole more and more money to cover his ever-growing losses. He turned to serious crime, rather than face the consequences of his mistakes in the commodities market. As discussed above, Easterday could have ended his scheme at any time, but he chose not to do so. Only once Tyson began asking questions about the cattle he had promised to, but did not, purchase did Easterday come clean. *See* ECF No. 26 (Presentence Investigative Report ("PSR") at 7 n.2.

### 3. *Seriousness of the Offense; Promote Respect for the Law; Provide Just Punishment*

A sentence at the high end of the amended guideline range (the low end of the original guideline range) reflects the seriousness of the offense, promotes respect for the law, and provides a just sentence. Easterday committed a very serious crime—one that involved unabashed fabrications, continued over several years, and eventually culminated in the theft of nearly a quarter of a billion dollars. It necessitates stiff punishment.

Indeed, a sentence at the high end of the applicable guideline range would show the public that a well-heeled defendant who steals nearly a quarter billion dollars through fraud does not receive a more lenient sentence than a defendant who, for instance, distributes 280 grams of crack cocaine. *See* 21 U.S.C. § 841 (imposing a ten-year mandatory minimum).

### 4. *Need to Deter Future Criminal Conduct*

Under Section 3553(a), the need for the sentence to "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), must also be considered. Here, the United States respectfully submits that a sentence at the top end of the amended guideline range of 97 to 121 months is necessary to serve this purpose. The enormity and audacity of Easterday's crimes has understandably captured the attention of both the public, generally, and members of the cattle and farming industries specifically. The deterrent message and effect of a high-end guideline sentence will resonate significantly with any individual tempted to engage in large-scale white-collar crime like Easterday.

A sentence of 121 months is appropriate for the further reason that white-collar crime can be seriously affected by the imposition of significant sentences. As the United States Court of Appeals for the 11th Circuit has observed, "[d]efendants in white collar [cases] often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). Thus, it is this type of mentality that is

most amenable to deterrence. *See, e.g., Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crime are prime candidates for general deterrence." (internal quotation marks and alteration omitted)); *United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997) ("[White collar] crime is not as feared as violent crime or drug offenses, but like the latter it requires heavy sentences to deter because it is potentially very lucrative.").

     5.    *Need to Avoid Unwarranted Disparities*

Under 18 U.S.C. § 3553(a)(7), the Court should consider the "need to avoid unwarranted sentencing disparities." The Sentencing Guidelines have taken into account the relevant factors and are in and of themselves a means to avoid unwarranted sentencing disparities. A sentence of 121 months in prison not only falls within the amended guideline range, but it falls in the right place given the magnitude of fraud: at the high end.

Such a sentence would be consistent with the findings of the court in *United States v. Parris*, which ordered the parties to compile sentences for large-scale fraud cases, and even conducted research of its own:

> It was perfectly clear that there was a correlation between the losses in those cases and the periods of incarceration: Those who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); those whose losses were less than $100 million were generally sentenced to single-digit terms.

*United States v. Parris*, 573 F. Supp. 2d 744, 753 (E.D.N.Y. 2008).

The United States therefore submits that a sentence of 121 months is appropriate and would not result in an unwarranted disparity.

## V. **CONCLUSION**

For the foregoing reasons, the United States respectfully submits that the Court should deny Easterday's motion for a sentence reduction insofar as it seeks a reduction to 97 months' imprisonment. Rather, the largest reduction the Court should entertain is to 121 months' imprisonment, which is the high end of the amended guideline range. Such a sentence is sufficient, but not greater than necessary, to provide just punishment to Easterday for his crime, promote respect for the law, and deter the defendant and others from committing similar crimes in the future. *See* 18 U.S.C. § 3553(a).

Respectfully submitted this 7th day of February 2024.

| | |
|---|---|
| GLENN S. LEON<br>CHIEF, FRAUD SECTION<br>CRIMINAL DIVISION<br>U.S. DEPARTMENT OF JUSTICE | VANESSA R. WALDREF<br>UNITED STATES ATTORNEY |
| By: *John ("Fritz") Scanlon*<br>John ("Fritz") Scanlon<br>Assistant Chief<br>1400 New York Avenue NW<br>Washington, DC 20005<br>Telephone: (202) 304-2946 | by: *Ian Garriques*<br>Ian Garriques<br>Assistant United States Attorney<br>Post Office Box 1494<br>Spokane, WA 99210-1494<br>Telephone: (509) 353-2767 |

**CERTIFICATE OF SERVICE**

I hereby certify that on the date indicated herein, I caused a true and correct copy of the foregoing to be filed with the Clerk of Court using the CM/ECF System, which will send notification of such to all attorneys of record.

John ("Fritz") Scanlon
John ("Fritz") Scanlon
Assistant Chief, Fraud Section
Criminal Division
U.S. Department of Justice